UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CIV 6694

| | |
|---|---|
| Lee Friedman, Kenneth Greenberg, Marcel Kunz, and John G. Reams, Individually And On Behalf Of All Persons Similarly Situated, <br><br> Plaintiffs, <br> v. <br><br> VERIFIED IDENTITY PASS, INC., and DOES 1-50. <br><br> Defendants. | Civil Action No: <br><br><br> **JURY TRIAL DEMANDED**  |

## CLASS ACTION COMPLAINT

Plaintiffs, Lee Friedman, Kenneth Greenberg, Marcel Kunz, and John G. Reams ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class," as defined herein), by their undersigned attorneys, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on their investigation (made by and through counsel), which included, among other things, a review of: (a) public documents pertaining to Verified Identity Pass, Inc. ("VIP" or the "Company"); (b) newspaper and magazine articles (and other media coverage) regarding VIP and its business; and (c) other publicly available information concerning the Company. Many of the facts supporting the allegations contained herein are known only to Defendants (as defined herein) or are exclusively within their custody and/or control. However, Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this complaint after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. VIP was founded in 2005 with the idea of providing shorter wait times at airport security checkpoints. In order to accomplish this goal, the Company collected highly sensitive personal information such as customers' biometric and biographic data, which was encoded on a card called a "Clear Card." This gave customers access to an expedited security lane at certain airports across the United States. For this service, VIP customers paid an annual membership fee of approximately $199 which VIP called "Clear."

2. Plaintiffs were enrolled in VIP's Clear service during the relevant period of time stated in this complaint. Pursuant to VIP's account agreement, the Company expressly provided that customers who cancelled their membership prior to the expiration of their membership term would receive a pro-rated refund for the unused portion of their membership.

3. Despite the foregoing, on June 22, 2009, VIP abruptly ceased operations. The Company also stated that it would not be issuing refunds to its customers. Moreover, Plaintiffs are concerned that the Company has not properly secured and/or destroyed the highly confidential data collected by VIP. Therefore, without Court intervention, Plaintiffs have no assurance that the highly confidential information collected by the Company will not be sold or otherwise shared with third parties.

4. It is also important to note that immediately prior to ceasing operations, VIP was actively signing up new members and charging existing customers' credit cards for membership renewal fees (in some cases the renewal fees were for long term contracts lasting several years).

5. In this manner, VIP deceptively obtained money from consumers, breached its contract with customers, and has been unjustly enriched as a result. This consumer class action

has been brought to recover the economic damages incurred by Plaintiffs and the proposed Class resulting from VIP's deceptive and illegal conduct and to obtain injunctive relief against the use of highly confidential information provided by Class members.

## II. PARTIES

6.  Plaintiff Lee Friedman is a consumer who signed up for VIP's Clear program during the relevant time period and was damaged thereby.

7.  Plaintiff, Kenneth Greenberg is a consumer who signed up for VIP's Clear program during the relevant time period and was damaged thereby.

8.  Plaintiff, Marcel Kunz is a consumer who signed up for VIP's Clear program during the relevant time period and was damaged thereby.

9.  Plaintiff, John G. Reams is a consumer who signed up for VIP's Clear program during the relevant time period and was damaged thereby.

10. As stated herein, Plaintiffs bring this action in their individual and representative capacity on behalf of a proposed Class of any United States individual who was a member of VIP's Clear program at the time the Company ceased operations.

11. Defendant VIP is a Delaware Company which maintains its headquarters in New York City. The Company's website is located at www.flyclear.com (although the content has been removed and replaced with a notice stating that the Company has ceased operations). VIP was originally created by Court TV founder Steven Brill and debuted its services at the Orlando airport in June 2005. Memberships averaged approximately $199 per year and at the time it ceased operations, on June 22, 2009, VIP had approximately 250,000 members and was operating in 20 airports nationwide, including Denver, Dulles Washington D.C., Indianapolis,

Little Rock, New York LaGuardia, New York JFK, Newark, Oakland, Orlando, Reagan Washington D.C., Salt Lake City, San Jose, San Francisco and Westchester.

12. Plaintiffs allege that the acts detailed in this complaint were authorized or executed by Company officers, agents, employees or representatives, while actively engaged in the management of VIP's business or affairs. Therefore, whenever any reference is made in this complaint to VIP, such reference shall be deemed to include any and all predecessors, successors, parents, subsidiaries, affiliates and divisions of the Company.

13. Furthermore, the true names and capacities of defendants sued herein as Does 1 through 50, inclusive, are presently not known to Plaintiffs, who therefore sue these defendants by such fictitious names. Plaintiffs will seek to amend this complaint and include these "Doe Defendants" true names and capacities when they are ascertained. Each of the Doe Defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by Plaintiffs and the proposed Class as a result of Defendants' wanton and illegal conduct.

14. Defendants had a duty to disclose to Plaintiffs that the Company was unable to provide the Clear service as represented by Defendants. However, rather than disclosing this information to Plaintiffs, Defendants actively and fraudulently concealed the information. Defendants' fraudulent concealment tolls the running of any applicable statute of limitations. In the alternative, Plaintiffs could not have, with the exercise of reasonable caution, prudence, or diligence, discovered Defendants' fraudulent scheme within the applicable statute of limitations. As a result, the statute of limitations is tolled in this instance which makes Plaintiffs' claims timely filed.

## III. JURISDICTION AND VENUE

15. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1332 as amended. The matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and no more than one-third of the members of the plaintiff "Class" (as defined below) reside in New York.

16. Venue is proper in this District pursuant to Section 28 U.S.C. §§1391(b) and (c). Many of the acts and practices complained of herein occurred in substantial part in this District and VIP is headquartered in this District.

## IV. FACTUAL ALLEGATIONS

17. Stephen Brill ("Brill") founded VIP in 2005 with the idea of providing shorter wait times at airport security checkpoints. Brill served as VIP's Chief Executive Officer ("CEO") until February 2009.

18. VIP touted itself as the first privately run "Registered Traveler" ("RT") program operating at a U.S. Airport. The RT concept was originally authorized under the Aviation and Transportation Security Act ("TSA") as a means to establish requirements to implement trusted passenger programs and use available technologies to expedite security screening of passengers who participate in such programs.

19. VIP initially launched its Clear service at the Orlando, Florida airport on July 19, 2005. According to the Company's promotional material, VIP's Clear service allowed customers to circumvent long lines typically found at several nationwide airport security checkpoints. In order for the Company to provide this service, VIP required customers to provide certain personal information which included, among other things, name, address, iris and fingerprint

images as well as a social security number. Once a client's biographical information was verified and approved, the VIP customer would be provided a "Clear Card" which would allow them to bypass normal security lines and check-in at VIP's "Clear Lanes" instead.

20. The average yearly enrollment fee for VIP customers, while the Company was in business, was $199.00. VIP also offered extended memberships of up to 10 years costing in excess of $1,000.00. A customer's credit card would automatically be charged a renewal fee at the expiration of each term.

21. VIP account agreements provided in part:

> [s]hould you cancel your Clear membership, your card will be deactivated and you will receive a pro rated refund of your Clear membership...
> [i]f for any reason TSA revokes your Clear membership, your card will be deactivated and you will receive a pro rated refund of your Clear membership.

22. On February 19, 2006, VIP announced that it had reached two significant milestones - the passage of 1,000 members through its Clear Lanes in one day and the enrollment of its 15,000th member.

23. On August 4, 2008, VIP was hit with a set-back when the TSA announced that it was suspending VIP enrollment due to vulnerabilities discovered in the Company's storage of customers' sensitive personal information. According to the TSA, an unencrypted VIP laptop computer was discovered to be missing from San Francisco International Airport on July 26, 2008. The computer purportedly contained pre-enrollment records of approximately 33,000 VIP customers.

24. On August 11, 2008, after the laptop had been located and further investigation conducted, and the TSA's finding that VIP had met the required program encryption standards, VIP was allowed to resume enrollment.

25. Less than two weeks later, on August 20, 2008, VIP announced that it had secured $44.4 million in venture funding. This new funding was led by new investor Spark Capital and also included a second investor, Syncom Venture Partners. Existing investors included Lockheed Martin, GE Security, Baker Capital, Lehman Brothers, and Brill. VIP stated that it would use the financing to further its membership growth in its existing markets and further expand in new major markets across the country.

26. In February 2009, the new investors and other investors in the Company pressured Brill to take certain steps which Brill considered inappropriate and unethical. Consequently, Brill publicly announced that he was stepping down as CEO for VIP. Brill's resignation became effective on March 1, 2009.

27. Following Brill's departure, investors which previously provided additional funding for the Company in 2008 took control of VIP.

28. However, on the evening of June 22, 2009, VIP abruptly ceased operations. The content of the VIP website was removed (*see* www.flyclear.com) and replaced with a statement that the Company was ceasing operations, effective immediately. The website also provided notice that VIP would not be issuing its customers refunds.

29. Since the Company has ceased operations, Plaintiffs are also concerned that VIP has not properly secured and/or destroyed highly confidential data collected by the Company. Plaintiffs concerns are warranted since vulnerabilities were previously discovered in the Company's storage of members' sensitive personal information. Therefore, without Court intervention, Plaintiffs have no assurance that the highly confidential information collected by

the Company will not be sold or otherwise shared with third parties and will be unable to receive refunds for services no longer provided by VIP.

30. Moreover, the Court should Order Defendants to provide a credit monitoring service, credit insurance, reimbursement of any out-of-pocket expenses (including reimbursement for payments made to freeze or unfreeze one's credit) and/or compensation for time, effort and disruption occasioned by any breach of the Class members' highly confidential information, to be paid for by Defendants for a period of three years from June 22, 2009, the date on which VIP ceased operations.

## V. CLASS ALLEGATIONS

31. Plaintiffs bring this action as a class action pursuant to Rule 23 of the *Federal Rules of Civil Procedure*, as well as the provisions of CPLR §901, on behalf of the following "Class" of persons:

> All persons who were enrolled in Verified Identity Pass, Inc.'s Clear program as of June 22, 2009. Excluded from the Class are Defendants, any parent, subsidiary, affiliate, officer, or director of VIP, any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

32. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of members of the Class is unknown to Plaintiffs at the present time, and can only be ascertained from books and records maintained by VIP, Plaintiffs believe that there are approximately 250,000 members of the Class.

33. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in class actions and consumer litigation and intend to prosecute this action vigorously. Plaintiffs are members of

the Class and do not have interests antagonistic to, or in conflict with, other members of the Class.

34. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class purchased VIP memberships and have sustained damages arising out of the same wrongful course of conduct alleged herein.

35. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members. Among the questions of law and fact common to the Class are:

    i. Whether the laws complained of herein were violated by Defendants' acts and/or omissions as alleged;

    ii. Whether Plaintiffs and the other members of the Class have sustained damages and, if so, the appropriate measure thereof;

    iii. Whether injunctive relief is appropriate in this matter;

    iv. Whether Defendants knowingly, intentionally, or negligently charged Plaintiffs and other members of the Class for services which could not be provided;

    v. Whether Defendants wrongfully converted monies or property of Plaintiffs and other members of the Class;

    vi. Whether Defendants breached contracts it entered into with Plaintiffs and other members of the Class;

    vii. Whether Defendants have properly maintained reasonable procedures to protect Class members highly confidential information; and

  viii. Whether Defendants have engaged in deceptive or unfair acts and practices in violation of New York State's Consumer Protection Statute.

36. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since, among other things, joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by many individual Class members may be relatively small, the expense and burden of individual litigation makes it virtually impossible for Class members individually to seek redress for the wrongful conduct alleged. Plaintiffs do not foresee any difficulty in the management of this litigation that would preclude its maintenance as a class action.

37. Notice can be provided to persons who purchased VIP memberships by a combination of published notice and first class mail, using techniques and forms of notice similar to those customarily used in other class actions.

## COUNT ONE
## Breach of Contract

38. Plaintiffs reallege ¶¶1-37 as if fully set forth herein. This Count is asserted against VIP, on behalf of Plaintiffs and the proposed Class.

39. VIP, either expressly and/or implicitly, contractually agreed to provide its Clear service to Plaintiffs and members of the Class for determined periods of time.

40. Plaintiffs and the Class performed their obligations under these contracts with VIP by, among other things, paying membership fees of approximately $199 per year to VIP for its Clear program.

41. VIP breached its contract by collecting revenues from Plaintiffs when it knew or should have known that it could not provide the Clear service under the terms of its contract.

42. VIP's breach of these contracts has caused damage to Plaintiffs and the Class and Plaintiffs seek a refund of all improper and/or illicit charges on behalf of themselves and the proposed Class.

## COUNT TWO
## Deceptive Trade Practices in Violation of New York GBL § 349

43. Plaintiffs reallege ¶¶1-42 as though fully set forth herein. This Count is asserted against Defendants, on behalf of Plaintiffs and the proposed Class.

44. *New York General Business Law* §349 provides, in part, as follows:

   a. Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

   * * *

   b. In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, which ever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

45. Defendants, by engaging in the conduct described above, have engaged in deceptive trade practices and have thereby violated §349 as stated herein.

46. As a result of Defendants' deceptive acts and practices, Plaintiffs and all other Class members have suffered, and will continue to suffer, substantial injuries and damages for which Defendants are liable.

47. Unless enjoined from doing so, Defendants will continue to violate this statute, for which violations Plaintiffs and all other Class members have no adequate remedy at law.

## COUNT THREE
## Conversion and Unjust Enrichment

48. Plaintiffs reallege ¶¶1-47 as though fully set forth herein. This Count is asserted against Defendants, on behalf of Plaintiffs and the proposed Class.

49. When VIP ceased operations, and thereby breached its contract between the Company and the proposed Class, it no longer maintained a legal interest in money paid by Class members for its services. Furthermore, VIP no longer had a legal interest in the highly confidential information provided by Class members which is of great value not only to Class members, but to other business entities.

50. Furthermore, if VIP is allowed to maintain possession of its customers' highly confidential information while no longer providing services as promised, Defendants will be unjustly enriched and may still benefit from the use or sale of this information even though the Company has ceased operations.

51. Therefore, unless enjoined from using this information and without a Court Order requiring the destruction of Class members' highly confidential information, Class members will suffer damages and/or continue to suffer damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, pray for relief and judgment, as follows:

    a. Determining that this action is a proper class action;

    b. Certifying the proposed Class as set forth herein, with Plaintiffs as Class representatives and their counsel as Class counsel;

c. Awarding compensatory and/or restitutionary damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

d. Awarding Plaintiffs and the Class injunctive relief ordering Defendants to secure and destroy Class members highly confidential information and preventing Defendants from sharing confidential information with any third parties;

e. Requiring Defendants to pay for monitoring of Plaintiffs' and other Class members' financial accounts, as well as to compensate Class members for any or all damages that may arise from the unauthorized release of their highly confidential information;

f. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

g. Awarding such other and further relief as the Court may deem just and prop

### JURY DEMAND

Plaintiffs demand a trial by jury on all claims set forth herein.

Dated: July 28, 2009

FARUQI & FARUQI, LLP

By: _____
David H. Leventhal, Esq. (DL-7673)

369 Lexington Avenue, 10th Floor
New York, NY 10017
Tel: (212) 983-9330
Fax: (212) 983-9331
Email: dleventhal@faruqilaw.com

**FARUQI & FARUQI, LLP**
Vahn Alexander, Esq.
1901 Avenue of the Stars, 2nd Floor
Los Angeles, CA 90067
Tel: (310) 461-1426
Fax: (310) 461-1427
Email: valexander@faruqilaw.com

**THE BRAND LAW FIRM, P.A.**
Craig Brand, Esq.
2816 E. Robinson Street, 2nd Floor
Orlando, FL 32803
Tel: (877) 407-2726
Email: craig@thebrandlawfirm.com

*Counsel for Plaintiffs*

## STATEMENT REGARDING RELATED CASE

Case No. 09-cv-5951 titled *Perkins v. Verified Identity Pass, et al.* is deemed related because it is filed against the same defendant and there are similar questions of fact and law.